# UNITED STATES DISTRICT COURT

_____ NORTHERN _____ DISTRICT OF ___ ILLINOIS, EASTERN DIVISION ___

UNITED STATES OF AMERICA

v.

OLUBUNMI MASHA (aka Massa) and
OLABISI ADEYEMI-BAJO (aka Moni)

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

**CASE NUMBER:**

**07CR   733**

**MAGISTRATE JUDGE VALDEZ**

FILED
NOV 06 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

1.      From in or about <u>November 2005 to March 2007,</u> in <u>Cook</u> _____ county, in the ___ Northern District of ___ Illinois ___, and elsewhere, defendants did conspire with each other and with other persons to knowingly, and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and regulations prescribed thereunder, structure and assist in structuring transactions at domestic financial institutions by depositing and causing the deposit of United States currency in amounts under $10,000, in violation of Title 31, United States Code, Section 5324(a)(3);

in violation of Title ___ 18 ___ United States Code, Section ___ 371 _____.

2.      From in or about <u>January 2004 to November 2007,</u> in <u>Cook</u> _____ county, in the ____ Northern District of __ Illinois ____, and elsewhere, defendant OLUBUNMI MASHA (aka Massa) did knowingly conduct, control, manage, supervise, and direct an unlicensed money transmitting business that affected interstate and foreign commerce in any manner or degree;

in violation of Title ___ 18 ___ United States Code, Section ___ 1960 _____.

I further state that I am a <u>Special Agent, Drug Enforcement Administration</u>, and that this complaint is based on the following facts:  See attached affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes     ____ No

<u>Christopher Dillard</u>
Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>November 6, 2007</u>    at
Date

<u>Chicago, Illinois</u>
City and State

<u>MARIA VALDEZ, U.S. Magistrate Judge</u>
Name & Title of Judicial Officer

<u>Maria Valdez</u>
Signature of Judicial Officer

2

COUNTY OF COOK              )
                           )        SS
STATE OF ILLINOIS          )

### AFFIDAVIT

I, Christopher Dillard, being first duly sworn on oath, depose and state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been so employed for over nine years and am presently assigned to the Chicago Field Division. In connection with my official DEA duties, I investigate criminal violations of federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, and 846. I am an "investigator or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have received specialized training in the enforcement of federal narcotics laws. I have also received specialized training in money laundering, structuring, and federal reporting requirements regarding the deposit, transfer, transportation, *et cetera*, of money and financial instruments. Based on my training and experience as a DEA agent, I am familiar with the manner in which narcotics traffickers and others conduct their drug-related businesses, including their methods of importing and distributing narcotics, their use of telephones in furtherance of their illegal activities, and their use of structuring methods and money laundering to conceal and distribute their narcotics proceeds.

3.      The following information is based upon my own personal observations,

knowledge, and information received from other law enforcement officers and a confidential source of information (hereinafter "CS-1"). As a result of my participation in this investigation, I am familiar with all aspects of this investigation as described in this Affidavit. Since this Affidavit is being submitted for limited purposes, I have not included each and every fact known to me concerning this investigation.

### *Background of CS-1*

4.      This investigation has involved the use of CS-1, who has been able to infiltrate and gain the trust of multiple members of the organization being investigated. CS-1 has never been arrested and has no criminal record or criminal history. CS-1 is cooperating in this investigation for two reasons. One of these reasons is to obtain assistance from the federal government regarding applications for adjustment for permanent residence for CS-1 and his/her child with Immigration and Customs Enforcement (ICE). The second reason is to obtain consideration by federal authorities for a sentence reduction for an associate of CS-1 who is currently incarcerated in federal prison. To date, no promises have been made to CS-1 regarding either issue. To date, CS-1 has been paid $500.00 for his/her work for DEA, in addition to reimbursement of operational expenses stemming from this investigation.

5.      During the course of this investigation, at the direction of DEA agents, CS-1 has participated in several recorded and unrecorded telephone calls and meetings with various members and associates of the target organization, HOMEACCESS, INCORPORATED (hereinafter "HOMEACCESS"). To date, CS-1 has conducted approximately eight structured transactions involving the deposit of over $150,000 in

2

Official Advanced Funds ("OAF"), some of which were purported to be narcotics proceeds, to HOMEACCESS and/or one of its agents, for eventual transfer to an undercover DEA agent ("UC-1") in Nigeria. Prior to each deposit/transaction conducted by CS-1, DEA agents provided CS-1 with a designated amount of OAF, recording equipment and general and specific instructions on what to say and do. CS-1 was required to sign for the OAF prior to receiving it, and before and after each transaction, CS-1 was searched for illegal narcotics, contraband and unexplained or excessive currency. Each search was negative. Furthermore, DEA agents conducted surveillance on CS-1 to and from each transaction in order to preserve the integrity of the OAF and the resulting evidence.

### ***Background of HOMEACCESS***

6.     The website for HOMEACCESS (www.thehomeaccess.com) contains the following description of the company: "Established in 1999 as money transfer company. HOMEACCESS engages in money transfer from the United States to Nigeria. HOMEACCESS appointed SPRING BANK PLC as her sole agent in Nigeria in 1999." The following is the mission statement of HOMEACCESS on its website: "To provide fast and secured International movement of money at low cost." Among the services listed on the website is to "Transfer money from the United States to any part of Nigeria and it is available same day on demand at any branch of OMEGABANK in Nigeria." Bank records show that during the period 2001 to 2007, accounts controlled by HOMEACCESS received approximately $27 million in net deposits, most of which was transmitted to banks outside the United States, primarily to SPRINGBANK PLC

3

(formerly known as the OMEGABANK PLC) and its branches in Nigeria. Bank records show that the following approximate amounts were transmitted out of the United States (primarily to Nigeria) from HOMEACCESS bank accounts or bank accounts of associates of HOMEACCESS:

| 2003 | $1,318,000 |
| 2004 | $5,083,000 |
| 2005 | $2,618,000 |
| 2006 | $ 597,000 |
| 2007 | $ 112,000 |

7.     The website lists the world headquarters of HOMEACCESS at "4126 Pleasantdale Road, Suite B215, Atlanta, GA 30340," and claims that HOMEACCESS has approximately 144 agents, 22 locations in the United States, and 2 locations in Canada. When money is collected from customers by HOMEACCESS or any of its agents, HOMEACCESS transmits the funds to SPRINGBANK PLC (formerly known as the OMEGABANK PLC), its branches in Nigeria, and to other banks overseas.

8.     Since July 1, 2003, the State of Georgia requires a business engaged in money transmission, such as HOMEACCESS, to have a license issued by the State of Georgia, and makes engaging in such a business without a license a felony. Based on records of the State of Georgia, HOMEACCESS has never received a license from the State of Georgia to engage in the business of money transmission. Further, HOMEACCESS was not licensed, as required, under Illinois law.

4

### *Applicable Law*

9.    At times material to this affidavit, Title 18, United States Code, Section 1960, provided:

   (a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

   (b) As used in this section --

   (1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and --

   (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; . . . or

   (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

   (2) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier . . . .

10.    At times material to this affidavit, Title 31, United States Code, Section 5313(a), and Title 31, Code of Federal Regulations, Section 103.22, required domestic

financial institutions to prepare and file with the Internal Revenue Service a Currency Transaction Report (Form 4789) ("CTR") for any transaction involving currency of more than $10,000, and Title 31, United States Code, Section 5324(a)(3) made it a criminal offense to knowingly and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and regulations prescribed thereunder, to structure and assist in structuring transactions at domestic financial institutions.

11.    Title 18, United States Code, Section 371, makes it a federal offense for two or more persons to conspire to commit an offense against the United States when one or more of such persons do any act to effect the object of the conspiracy.

### *Background of Targets*

12.    The investigation has revealed, among others, the following three targets associated with HOMEACCESS:

a.    OLUBUNMI MASHA (aka Massa) (hereinafter "MASHA"): believed to be a black female of Nigerian heritage, living in the Atlanta, Georgia, area and, more recently, also in the State of New York.  The investigation has shown that she is the manager of HOMEACCESS and she has been the principal contact, coordinator, decision-maker and leader for the transactions involving CS-1 and HOMEACCESS. Corporate records from the State of Georgia for 2005 list "BUNMI MASHA" as the Chief Executive Officer (CEO) of HOMEACCESS, 4126 Pleasantdale Road Lawrenceville, Georgia 30044;

b.    OLABISI ADEYEMI-BAJO ("MONI"): believed to be a black female of Nigerian heritage, living in the Atlanta, Georgia area.  The investigation has shown

6

that she is MASHA's primary assistant at the headquarters office and that she is familiar with all of the financial operations of HOMEACCESS. She provides guidance, assistance and direction to customers of HOMEACCESS when MASHA is unavailable.

### *Summary of Affidavit*

13.    In summary, this investigation has shown that HOMEACCESS uses its branch and headquarters locations in the Northern District of Illinois, the Northern District of Georgia, and elsewhere, to collect varying amounts of bulk currency and arranges/coordinates for these deposits, some of which are structured, to be made into various bank accounts for transfer outside the United States. This structuring is done to avoid detection by law enforcement authorities and to evade federal financial reporting requirements. The money is then transferred through multiple bank accounts via wire transfers and/or checks, finally ending up in accounts controlled by HOMEACCESS in Nigeria. When the funds are received in Nigeria, HOMEACCESS completes the transaction by arranging for the pickup of the money in Nigeria by recipients designated by the customers. As set forth below, CS-1 has conducted approximately eight structured transactions involving the deposit of over $150,000 to HOMEACCESS and/or one of its agents, for eventual transfer to Nigeria.

14.    Accordingly, there is probable cause to believe that MASHA has violated Title 18, United States Code, Section 1960, by knowingly conducting, controlling, managing, supervising, and directing an unlicensed money transmitting business, and that the above two targets have conspired, with each other and with others, in violation of Title 18, United States Code, Section 371, to structure and assist in structuring

7

transactions at domestic financial institutions in violation of Title 31, United States Code, Section 5324(a)(3). Further, the evidence shows that HOMEACCESS and MASHA operated the money transmitting business at many locations including Chicago, in the Northern District of Illinois. *See, e.g.,* ¶¶ 18-66, 71, 73, 85-92, 98, 106-108, below.

### *Background of Investigation*

15.    During a debriefing in a DEA investigation on or about September 2005, a cooperating defendant stated that he/she had sent proceeds of his/her heroin sales to Nigeria using HOMEACCESS. Also in September 2005, a check of the State of Georgia Secretary of State records listed Bunmi MASHA as the Chief Executive Officer of THE HOMEACCCESS, INC, 4126 Pleasantdale Road, Lawrenceville, GA 30044, and HOMEACCESS' website was located on the internet as www.thehomeaccess.com. The website listed 16 HOMEACCESS locations in the Chicago area. On or about October 6, 2005, agents conducted a trash search at one of the businesses listed on the website and obtained a "Sender Form", with "HOMEACCESS" and "OMEGABANK" printed at the top of the form, and a "Terms And Conditions of Money Transfer" form. During a debriefing in October 2005, CS-1 said that he/she was aware of a money service business in the Chicago area called OMEGABANK, which transmitted money to Nigeria. CS-1 stated that s/he had never used this money service because s/he never had large amounts of currency but that criminals who had large sums of money from drug dealing, credit card fraud, and other crimes would use OMEGABANK to send their money to Nigeria. In the same debriefing in October of 2005, CS-1 reported that on or about October 10, 2005, CS-1 went to a store on North Broadway in Chicago and spoke with

8

the owner.    CS-1 asked the owner if s/he could send money to Nigeria to OMEGABANK.  The owner stated that it could be done and if CS-1 wanted to send $20,000 to Nigeria, the owner could arrange to have the money available to be picked up in Nigeria all at once.  But, if CS-1 wanted to send the $20,000 using OMEGABANK, then CS-1 would have to break it up into four transactions of $5,000 each.

16.    On or about October 26 and 27, 2005, CS-1 met with the owner of another business in Chicago, IL, listed on the HOMEACCESS website. CS-1 said in a written statement that, during the meeting on or about October 27th , s/he had been told by this owner that, in order to send money to OMEGABANK via HOMEACCESS, CS-1 would have to deposit the money into a specific account at a Bank of America branch.  CS-1 would then fax the deposit receipt to HOMEACCESS  in Atlanta, Georgia, return to the business owner's location with the deposit slip and she (the business owner) would fill out a HOMEACCESS money transfer form to complete the transaction.

17.    On or about October 2005, through a check of the HOMEACCESS website, DEA agents became aware of a business in Chicago that was listed as a "money service business" location for HOMEACCESS.    On or about November 10, 2005, DEA agents showed CS-1 photographs of business locations that were listed on the HOMEACCESS website.  CS-1 was also shown photographs of a person (Individual A) and his business, and CS-1 stated s/he was familiar with the location and recognized Individual A as the owner.

### November 29, 2005 Deposit of $11,000 in Chicago, Illinois

18.    On November 10, 2005, at the direction of DEA, CS-1 made a series of

9

recorded telephone calls, one of which was to the headquarters office of HOMEACCESS in Atlanta, Georgia, at telephone number (678) 966-0001. CS-1 asked for the names of HOMEACCESS agents in Chicago from which money could be sent to OMEGABANK in Nigeria. An unidentified female at HOMEACCESS provided CS-1 with Individual A's business and told CS-1 that this was the only location presently in Chicago that could send money to OMEGABANK in Nigeria. The unidentified female at HOMEACCESS also told CS-1 that s/he could go directly to the Bank of America, use an account number provided by HOMEACCESS to deposit the money, fax the deposit slip to HOMEACCESS and then they would complete the transaction to OMEGABANK in Nigeria.

19.    That same day, CS-1 placed a recorded telephone call to Individual A's business and spoke with Individual A. Individual A told CS-1 that he remits money through OMEGABANK, that it requires a lot of documentation and that any amount above $10,000 has to be reported. Individual A also stated that the agency in charge of such transactions was located in Atlanta.

20.    On or about November 28, 2005, at the direction of DEA, CS-1 made a recorded telephone call to Individual A's business. CS-1 asked for and spoke with Individual A. During the call, Individual A told CS-1 that they could meet the next day at approximately 3:30 pm to send money to OMEGABANK in Nigeria, but that CS-1 would need identification to send any amount more than $10,000.

21.    On or about November 29, 2005, DEA agents provided approximately $11,600 OAF and recording equipment to CS-1, and CS-1 drove the money to

10

Individual A's business. CS-1 entered the business with the $11,600 in his/her possession. DEA agents noted that there was a blue car registered to Individual A parked in the lot behind the building.

22.    After CS-1 entered the business, Individual A took CS-1 to an adjacent office to count the money. While CS-1 counted the money, Individual A was talking on the telephone to an unknown individual about making the money transfer. CS-1 noted that Individual A was writing information that he appeared to be receiving from the other person on the phone on a transfer form. After CS-1 had completed counting the money, Individual A then counted the money and finished filling out the transfer forms. CS-1 stated Individual A said the money would be sent to an OMEGABANK branch in Nigeria and would be available for pick-up in a day or two. Individual A and CS-1 then discussed CS-1's driver's license, the amount of the deposit, and the fee for the transfer. Individual A also received another phone call during which he explained to the caller that the customer who had the $11,000 was already there. He then provided CS-1's sender information to the caller and asked a couple more questions of CS-1 during the call. Individual A and CS-1 also discussed how OMEGABANK branches were safe places for CS-1's associates to pick-up the money in Nigeria. During this investigation, CS-1 claimed to have an associate in Nigeria who would pick-up the money sent to that country by CS-1. In reality, this associate was a DEA agent acting in an undercover capacity (hereinafter "UC-1") in Nigeria.

23.    At that point, Individual A stated, "We are going to split it in two parts. One for 6,000, another one for 5,000.....Is [UC-1] a Nigerian? [UC-1] has an ID?" [meaning

11

that Individual A was explaining how they would split CS-1's money in amounts under $10,000, which would avoid federal reporting requirements. Individual A also wanted to be sure that CS-1's associate in Nigeria (UC-1) had a Nigerian identification card that would enable UC-1 to pick up the money].

24.    At approximately 4:58 pm, DEA agents saw CS-1 leave Individual A's business, get into his/her car and drive back to a predetermined meet location. There, CS-1 gave DEA agents the recording device, a fifty dollar bill, two HOMEACCESS money transfer forms and a newsletter style brochure entitled "Let's Talk Money." CS-1 explained that Individual A split the $11,600 into two transactions ($5,250 and $6,300 respectively), with two separate transfer control numbers, and CS-1 kept the remaining fifty dollar bill, which s/he returned to DEA. CS-1 stated that s/he filled out all the sender information on the left side of the forms. Individual A filled out the information on the right side of the forms in the shaded area designated "Agency Use Only" as follows:

| Agency Code | CH02 | CH02 |
|---|---|---|
| Homeaccess Operator | Bunmi | Bunmi |
| Charges | 250 | 250 |
| Total Amount | 5,250 | 6,300 |
| Exchange Rate | 136 | 136 |
| NAIRA to be Collected | 680,000 | 816,000 |
| Transfer Control Number | T31195ZH | T31196ZH |

25.    At approximately 5:05 pm, DEA agents saw Individual A leave his store

12

carrying something in his hand, and he went to the JP Morgan Chase Bank ("Chase Bank") branch located at 9138 South Commercial Avenue in Chicago. According to bank records obtained by DEA, Individual A made a single cash deposit of $11,550.00 on November 29, 2005 at approximately 5:14 pm to a Chase Bank savings account held in Individual A's name and the name of another woman, possibly his wife. On December 1, 2005, at approximately 11:38 am, Individual A withdrew $11,550.00 in cash from this same account and deposited it into a Washington Mutual Bank ("Washington Bank") checking account held in the name of his business. On or about December 6, 2005, Individual A wrote a check from the same Washington Bank account, payable to HOMEACCESS and bearing the memo notation, "Money Transfer." This check was deposited to a Bank of America checking account number 0032-6303-4540, which was held in the name HOMEACCESS.

26.    On or about December 12, 2005, there was a $45,000 transfer from the HOMEACCESS Bank of America account number 0032-6303-4540, to another HOMEACCESS Bank of America account number 0032-7189-0115. Later that same day, there was a $100,000 wire transfer from HOMEACCESS Bank of America account number 0032-7189-0115 to an OMEGABANK account in Nigeria. Affiant believes that this transfer completed the transaction of CS-1's money to Nigeria.

27.    On or about December 14, 2005, UC-1 went to an OMEGABANK branch in Nigeria to retrieve the funds sent to him/her by CS-1 on or about November 29, 2005. The bank branch coordinator told UC-1 that the bank did not have enough U.S. Currency to provide UC-1 with the money owed, but that the bank would call when they

13

did.  On or about December 21, 2005, UC-1 returned to OMEGABANK and picked up 1,496,000 Naira, which is the approximate equivalent of $11,000 U.S. Currency.

28.    Sometime during January 2006, Individual A moved his business from one location to another in Chicago, Illinois.  This move was confirmed by surveillance and a business card that Individual A had given to CS-1 on or about January 3, 2006.

### January 19, 2006 Deposit of $13,335 in Chicago, Illinois

29.    On January 18, 2006, CS-1 made approximately four recorded telephone calls to Individual A's business in an attempt to coordinate another cash transaction to Nigeria.

30.    On January 19, 2006, agents provided CS-1 with $13,400 OAF and watched CS-1 drive to Individual A's new business location and enter the business at approximately 10:15 am.  During the meeting, Individual A and CS-1 discussed the exact amount to be deposited and the fee involved, and Individual A stated that they again would do the transaction in two parts.

31.    At approximately 11:17 am, DEA agents saw CS-1 leave Individual A's business and drive to a predetermined meet location.  There, CS-1 turned over to DEA the body recorder, two HOMEACCESS money transfer forms and sixty-five dollars in cash.  CS-1 explained that Individual A split the $13,400 into two transactions ($5,250 and $8,085 respectively), with two separate transfer control numbers, and CS-1 kept the remaining sixty-five dollars, which s/he returned to DEA.  CS-1 stated that s/he filled out all the sender information on the left side of the forms.  Individual A filled out the information on the right side of the forms in the shaded area designated "Agency Use

14

Only" as follows:

| Agency Code | CH02 | blank (no information) |
|---|---|---|
| Homeaccess Operator | Bunmi | blank (no information) |
| Charges | 250 | 385 |
| Total Amount | 5,250 | 8,085 |
| Exchange Rate | 136 | 136 |
| NAIRA to be Collected | 680,000 | 1,047,200 |
| Transfer Control Number | T31569BJ | T31570BJ |

32.     According to bank records obtained by DEA, $13,340 was deposited into Individual A's Washington Bank business checking account. On or about February 3, 2006, Individual A wrote check number 3049 from this business account payable to HOMEACCESS for $14,405 and deposited it on or about February 13, 2006 into the HOMEACCESS Bank of America checking account number 0032-6303-4540. In the memo section of check number 3049 was listed five transfer control numbers with names listed next to each number. These control numbers are similar to the ones provided to CS-1 on the HOMEACCESS forms in that they begin with a "T", followed by five digits listed and two letters. The first name listed next to a control number appears to be "ONISERRON," the second name listed is "Individual A," the third and fourth names are CS-1, and the fifth name appears to be "ADEKOYA, ABISOYE."

33.     On or about January 30, 2006, UC-1 was able to collect approximately 1,727,200 Naira, which is equal to approximately $12,700, from OMEGABANK in

15

Nigeria.   On or about February 15, 2006, $17,000 was wire transferred from the HOMEACCESS Bank of America account number 0032-7189-0115 to an OMEGABANK account in Nigeria.

### March 2, 2006 Deposit of $9,450 in Chicago, Illinois

34.     On or about March 1, 2006, CS-1, participated in an unrecorded call with MASHA, to discuss the possible transfer of $25,000 to OMEGABANK in Nigeria. MASHA told CS-1 that HOMEACCESS could not issue a control number to CS-1 if the recipient of the $25,000 wanted to retrieve the currency in U.S. dollars in Nigeria. According to MASHA, CS-1 would have to deliver the $25,000 to a HOMEACCESS location, provide his/her personal identification, and provide the name of the recipient and a test question and answer for use in Nigeria.  MASHA would then let CS-1 know when the currency was transferred and available for pick up in Nigeria.

35.     Later that same day, at the direction of DEA, CS-1 participated in recorded calls with MASHA and MONI at HOMEACCESS in Georgia (telephone number (678) 966-0001).  During one of the calls, CS-1 asked to speak with MASHA but was told by MONI that MASHA was not available.  CS-1 explained to MONI that s/he talked to MASHA about the $25,000 transaction and had a question about leaving the money with Individual A without a transaction or control number.  CS-1 stated, "So it is very important that I talk to her because she has been expecting my call." MONI replied, "Yeah...what did your...like she said you were going to call somebody." CS-1 then said, "Yes, I told her [I] am going to call my boyfriend. You understand what I mean?" MONI then said, "OK. So what is it your question now?" CS-1 explained, "The question is that,

em....you know because we haven't done this money in the way she wants me to do it. Like she said I have to drop the money to [Individual A]." MONI replied, "Yeah," and CS-1 continued, "And when I drop the money for [Individual A]..." MONI again said "Yeah," and CS-1 stated, "Then by Friday they will pick the money up from... Friday...on Friday? They will pick the money up in Lagos?" MONI again replied, "Yeah," and CS-1 continued, "So my boyfriend....you know.....because we haven't done it this way...he was" (CS-1 is referring to a fictitious person, whom agents directed CS-1 to refer to as the source of the money deposited by CS-1, who was not comfortable with HOMEACCESS' method of operation) and is interrupted by MONI, "Because .....because of the transfer number, right?" CS-1 replied, "Ehn....because of the transfer number. So he is little bit confused. You know like," and is again interrupted by MONI, who stated, "The problem is that there is one of their boss..." CS-1 interrupted by asking, "One of their boss?...," and MONI continued, "That normally helps us at Lagos. That helps us out with dollars, and she will call that man. That man will tell you to come. By the time he tells you to come...." CS-1 interrupted again, "In Lagos?" and MONI replied, "Yeah. At the head office. His name is [Individual B]." When CS-1 asked for his last name, MONI stated it twice, and then spelled it for CS-1. MONI then explained that Individual B was not currently in the office in Lagos.

36.    Further explaining Individual B's role, MONI stated, "He is in Treasury. He is the guy that normally helps us out with dollars. If somebody is collecting dollars in bulk, we call him and tell him, 'OK uncle. Please, do you have dollars? Please, some people will be collecting certain amount of money." That is why we don't do it through a

transaction.  Because if we do it through a transaction, those ones may not have dollars.  It may become come today, come tomorrow.  But if we call INdividual B, Individual B will say, 'OK, I will get it ready for you guys.'"  CS-1 replied, "OK, she said I can't be able to do all the money at once" (meaning that MASHA told CS-1 that CS-1 cannot send $25,000 at one time).  MONI exclaimed, "At once?  Never!  Never!"  CS-1 asked, "Why?" and MONI replied, "It is too much.  You don't want to do that type of risk."  CS-1 stated, "But...let's say...three months ago, the first one I did.  Let's say maybe it is about eleven thousand something" and MONI interrupted, "You did not send it at once...You did one five.  You did one six" (meaning that when CS-1 deposited $11,550.00 on or about November 29, 2005, it was divided by Individual A into two transactions of approximately $5,000.00 and $6,000 each).  CS-1 stated, "I did it the same time" and MONI replied, "That's why I am giving the explanation.  Be patient.  What I am saying is that you did not do it at that eleven straight.  You divided it."  CS-1 agreed, "We split it into two."

37.    As the call continued, MONI stated, "That is what we are doing now.  We can't send it in bulk like that.  Only if you want this place closed the next day.  You know how this country is now."  CS-1 stated, "I am not saying that I want you...to close you the next day.  But what I am saying is that there is no money control number.  That is the reason why you have to be, you know, have to be careful.  You understand what I mean" (meaning that CS-1 and his/her supposed friend were concerned that if there is no record of the money being transferred, then there is no way to ensure that the money will get to Nigeria as planned).  MONI stated, "I know, I know.  It is not a little amount we

18

are talking about. If I am in the same shoes, I will be so skeptical about it as well. But [Individual A] is one of our agents. Even now, she doesn't know because she is going to call [Individual A] and talk to [Individual A]" (meaning that MASHA would call Individual A to discuss the concerns of CS-1). CS-1 stated, "And they just want me to drop twenty five thousand for [Individual A] and come back without no receipt or, you understand, one has to be careful." MONI said, "[Individual A] can give you a receipt that he can say that he took a certain amount from you. You were located here. It will be easier for us. We can ask you to walk into our office," and CS-1 asked, "So I can come and do it in Atlanta?" MONI replied, "Yeah!" (meaning that if CS-1 or his/her friend was not comfortable with sending the money through Individual A, then CS-1 could come directly to HOMEACCESS' office in Atlanta, GA). At the end of this telephone call, MONI identifies herself to CS-1 as MONI.

38.    Later on that same day, CS-1 participated in another recorded call with MONI to determine whether UC-1 could retrieve the funds in US Dollars or Nigerian Naira in Nigeria and whether HOMEACCESS will provide CS-1 with a transfer control number. Referring to CS-1's previous conversation with MASHA, MONI states, "Oh. Ok. She will give you a transaction number." CS-1 replies, "Transaction how? She will give me a control number?" MONI replies, "Yes, she will give you a control number." When CS-1 asks, "Here?", MONI replies, "No, yes, here at the woman's place when we do it." CS-1 then states, "Ok, because it is dollars I want to collect," and MONI replies, "The people that get the money don't have that kind of money there because you want dollars. That is what is happening. If they have dollars, she will do it for you with the

19

control number. Those people have no dollars readily [ready]. If you are insisting you want to [retrieve] dollars." CS-1 interrupts and says, "No. What Auntie Bunmi [MASHA] told me this morning is different. She said she did not want [to] take it through the system." MONI replies, "She thought you wanted to collect dollar." CS-1 replies, "Not true. Isn't Naira [what] the person collects. That person collects Naira from there before." MONI asks, "Is the person collecting it at home [referring to Nigeria] going to collect Naira?" CS-1 replies, "Yes," and MONI says, "Yes. She will do it. She will do it with control number." CS-1 then asks MONI to tell MASHA to call CS-1.

39.    In the next recorded call, MONI calls CS-1 and tells CS-1 to hold on to speak to MASHA. MASHA states, "She said the person will collect Naira?" (referring to CS-1's previous conversation with MONI about what kind of currency UC-1 would pick up in Nigeria), and CS-1 replies, "Yes, they will collect Naira." MASHA then states, "They will collect Naira at home [Nigeria] makes it easier." CS-1 starts to ask how the deposit should be made saying, "I should" and is interrupted by MASHA, who states, "You will do it four times" (meaning that CS-1 should split the $25,000 deposit into four smaller transactions or deposits). CS-1 asks, "Will the four times be done today?" and, although MASHA's initial reply is unintelligible, CS-1 then states, "Ok. So we do a small portion today." MASHA replies, "Yes, you do some today." CS-1 then states, "How can I do today?" (inquiring about how much of the $25,000 could be deposited that day). MASHA replies, "Don't let it exceed ten." When CS-1 asks, "Ten today?" MASHA restates, "No, not up to [ten]." To confirm the amount, CS-1 asks again, "How much?" and MASHA replies, "Do nine today." CS-1 then continues to clarify the deposit

procedure, "Hello, Auntie. You said I should do nine today. Ok. What will it be tomorrow?" MASHA's initial response is unintelligible and CS-1 then states, "I don't want anybody to know about my business. I will like it to be private. You know?" MASHA replies, "Do today's. I will call you tomorrow" (meaning she will give further instructions at that time on the next deposit). CS-1 makes one final clarification, saying, "Ok. I should do nine today," and MASHA replies, "Yes."

40.     In the next recorded call, CS-1 speaks with MONI about what time and day CS-1 will be able to deposit the money with Individual A. CS-1 also asks, "You are sure Mr. Individual A will be there?" MONI replies, "Yes. He will be there." CS-1 also says, "OK. OK. Auntie Bunmi said she can – that I should not use my name. She can get me another person? Another name? How is it?" MONI replies, "Yes. Don't use your name." Later in the conversation, MONI states, "It will be easier [unintelligible ("U/I")] to do it. She will not want it that it is only your name sending everything." CS-1 then asks, "But if I cannot find?" (meaning, what should CS-1 do if he/she can't find another person/s and/or identifications). MONI replies, "She will not do it at once. You will do it, but not in one attempt [meaning that the deposit will not be done all in the same day]. Do you understand?" CS-1 replies, "I get you." Later in the conversation, MONI states, "All we are talking about is only about three days" (meaning that all of CS-1's money can be divided into separate deposits over 3 days). If [you] call me tomorrow morning, if she can get someone that can do it. You can do two tomorrow" (meaning that if MASHA finds another person to assist with CS-1's deposit, 2 deposits can be made the next day). When CS-1 replies. "Ok," MONI clarifies the amount of one deposit saying,

21

"Maybe about nine thousand." In the next recorded call made on the same day as above, CS-1 states to MASHA, "I said do you feel – if somebody else wants to do the money form, does the person have to come with me or should I just get their ID?" MASHA replies, "Just get the ID." Later in the conversation, CS-1 asks, "I should just write the person's name?" and MASHA replies, "Yes."

     41.    Later that same day, CS-1 called Individual A, and stated, "Excuse me, sir – when they said – that Auntie Bunmi said that you were a bit tired that you cannot make it. So, after awhile, she said that the control number because it will be dollar, that it will be Naira. So, we have just concluded now. I have been talking to her all morning." Individual A replies, "I told her to call you." CS-1 then explains, "Hmm. What we discussed is that tomorrow morning – first thing tomorrow morning you will be in the office by ten o'clock. So, she said I will be able to [do] nine thousand tomorrow. She said maybe if she can find someone with ID or another name so that I should not do everything in my name. She said that I can only do nine thousand tomorrow. So, I said that I am not bothered that the following day we can do the rest." Individual A makes a comment about CS-1 coming to see him that night, but CS-1 states that he/she is going to church. Later in the conversation, CS-1 says, "Ok sir. So, she [referring to MASHA's and MONI's instructions about obtaining another identification] said someone else's ID. But, I said I will be the only one to do it. As long as I get an ID. But, I don't think I am ready to involve anybody with it." Individual A says something unintelligible, and CS-1 states, "But I don't [know] the way she wants to do it. She said if she can find someone else to do it that it will be my name only." Individual A replies, "It depends on how it is

22

done," and CS-1 states, "Ok. Sir. I will see you tomorrow. Thank you, sir."

42.    On March 2, 2006, CS-1 participated in a series of recorded telephone calls with MASHA at HOMEACCESS and a meeting with Individual A in Chicago regarding the transfer of money to Nigeria. During one of the calls, CS-1 told MASHA that s/he did not have any other person or identification to use as a sender for a portion of the currency to be transferred to Nigeria. MASHA instructed CS-1 to take only $9,000 of the $25,000 to Individual A for transfer to Nigeria and to call MASHA after the delivery of the money.

43.    Prior to the meeting with Individual A on or about March 2, 2006, DEA agents met with CS-1 at a predetermined location and provided CS-1 with $9,550 OAF. At approximately 12:10 p.m., CS-1 drove to Individual A's business, and DEA agents saw CS-1 get out of the vehicle and enter the business.

44.    Because the recording of this transaction was not clear, CS-1 was interviewed on May 9, 2007, regarding the March 2, 2006, transaction with Individual A. In summary, CS-1 stated that while inside Individual A's business on March 2, 2006, he/she delivered $9000 for transfer to Nigeria via HOMEACCESS, and a $450 fee, by giving the money to Individual A's female employee.

45.    At approximately 12:40 p.m. on March 2, 2006, DEA agents saw CS-1 leave Individual A's business and get into his/her car. CS-1 called a DEA agent and stated that s/he had delivered the $9,450 to Individual A and a female employee in the store. CS-1 then drove to a predetermined meet location, where CS-1 turned over the body recorder, the remaining $100 OAF, and a HOMEACCESS money transfer form.

CS-1 stated that s/he filled out all the sender information on the left side of the forms. Individual A filled out the information on the right side of the forms in the shaded area designated "Agency Use Only" as follows:

| Agency Code | CH02 |
|---|---|
| Homeaccess Operator | MONI |
| Charges | 450 |
| Total Amount | 9,450 |
| Exchange Rate | 136 |
| NAIRA to be Collected | 1,224,000 |
| Transfer Control Number | T31814DJ |

46.    According to bank records obtained by DEA, on or about March 3, 2006, $5,000 cash was deposited into Individual A's Washington Bank business checking account. Also on or about March 3, 2006, an additional $4,450 cash was deposited into Individual A's Washington Bank personal checking account.

47.    On or about March 6, 2006, there was a $5,000 transfer from HOMEACCESS Bank of America checking account number 0032-7189-0115 to another HOMEACCESS Bank of America checking account number 0032-6303-4540. On or about March 13, 2006, Individual A wrote a check from the personal account referred to in paragraph 46, payable to HOMEACCESS, for $5,523.75 and deposited it into HOMEACCESS' Bank of America checking account number 0032-6303-4540.

48.    On or about March 14, 2006, there was a $45,000 wire transfer from

24

HOMEACCESS Bank of America checking account number 0032-6303-4540 to the benefit of OMEGABANK in Nigeria.

49.    On or about March 28, 2006, Individual A wrote a check from his business account payable to HOMEACCESS for $4,450 and deposited it into HOMEACCESS Bank of America checking account number 0032-7189-0115.  On or about April 3, 2006, there was an additional $20,000 transfer from HOMEACCESS Bank of America checking account number 0032-7189-0115 to another HOMEACCESS Bank of America checking account number 0032-6303-4540.  On that same date, there was a $40,000 wire transfer from HOMEACCESS Bank of America checking account number 0032-6303-4540 to the benefit of OMEGABANK in Nigeria.

### _Follow-up Calls Between CS-1 and MASHA After March 2, 2006 Deposit of $9,450_

50.    CS-1 also participated in a series of unrecorded telephone calls with MASHA on or about March 2, 2006, immediately after CS-1's meeting with Individual A and his female employee.  During the calls, CS-1 confirmed to MASHA that s/he had delivered the $9,450 to Individual A.  MASHA told CS-1 that she (MASHA) has been working at HOMEACCESS since 1999 and that she does not expose her customers to risk, which is why she has so many loyal customers.  MASHA added that she knew an owner of a different store in Chicago, but that he was in Nigeria.  MASHA told CS-1 that the wife of this other owner could handle the transfer of the remaining funds for CS-1.  MASHA told CS-1 to drop off the remaining funds to the wife at her house on Sheridan Road in Chicago.  MASHA mentioned that the other owner and his wife know MASHA's

"way," but Individual A did not. MASHA said that she knew that CS-1 would be sending a lot more money in the future, but warned that CS-1 would get caught if s/he continued to use his/her own name as the sender for the transactions. MASHA stated that she would contact the other owner's wife and that she would find another person's identification for CS-1 to use as a sender. MASHA said that she wanted CS-1 and her to both be safe when sending all this money and that she would make sure CS-1 could send the remaining money on Friday.

51.    During a subsequent call, MASHA told CS-1 that she had called the wife of the other store owner, but she had not called back yet. MASHA told CS-1 that she would accept up to $40,000 and that CS-1 could come to Atlanta to conduct the transaction, if that would be easier for CS-1. MASHA reiterated that she would find a way to send the current remaining funds for CS-1 to Nigeria by Friday.

52.    On or about March 3, 2006, CS-1 made a recorded telephone call to MASHA in Georgia. During the call, CS-1 told MASHA that she did not keep her promise and call CS-1 back, but MASHA said that was because she never received a return call from the other store owner's wife. CS-1 stated that s/he discussed going to Atlanta to do a transaction with her friend, and MASHA said that it would be no problem. CS-1 emphasized that s/he wanted MASHA to find a way for CS-1 to deposit the rest of the money by Monday, March 6, 2006.

53.    On or about March 10, 2006, CS-1 called MASHA in Georgia. During the call, MASHA said that UC-1 had talked with Individual B in Nigeria about picking up the money sent by CS-1 to Nigeria. That same day, UC-1 had visited an OMEGABANK

26

branch in Nigeria, presented his/her local driver's license and picked up 1,224,000 Naira, the approximate equivalent of $9,000 U.S. Currency. When UC-1 obtained the money, UC-1 was also given a HOMEACCESS recipient form, reflecting transfer control number T31814DJ, which was the same transaction/transfer control number on the forms obtained by CS-1 on or about March 2, 2006 in Chicago.

### March 9, 2006 Deposit of $15,550 in Chicago, Illinois

54.    On or about March 6, 2006, CS-1 made a recorded telephone call to MASHA. During the call, CS-1 explained the concerns of his/her fictitious friend regarding the safety of these transactions to Nigeria. MASHA stated, "You can put [your friend] on the phone and tell [your friend] that we started operating this company since 1998. I joined them since 1999. I have been the manager for the past two and half years. You have to trust me." CS-1 replied, "Auntie when I did not get [my friend] yesterday [my friend] was gathering money all over and as you know that this is not going to be the only dealing we will have with you. Later on our mind will be at rest."

55.    MASHA also told CS-1 that there was more than one HOMEACCESS account at Bank of America and when CS-1 expressed concern about trusting MASHA with $15,550, MASHA assured CS-1 that she could be trusted because other people from all over Georgia have been bringing her large amounts of money, including cashier's checks for as much as $80,000 or $100,000. MASHA stated, "Yeah, and they transferred me their money. I break it down and I sent it at convenience. It won't give them or me any problem. HOMEACCESS accounts, that is where we put the money, not my personal account. It is not my account that you will deposit money, it is

27

HOMEACCESS' account, company account." MASHA added that her brother would meet CS-1 at a Bank of America branch and that he would deposit half of the money ($15,550) and CS-1 would deposit the other half. MASHA further explained that if her brother didn't want to deposit such a large part of the money at one time, then CS-1 and MASHA's brother could go to another bank branch to deposit the remaining funds (thus diminishing suspicion by bank officials or law enforcement).

56.    MASHA continued by explaining that after the deposits were made, the depositors would fax the deposit receipts to her. She would then issue the transfer control numbers to CS-1, but CS-1 would have to call MASHA with the recipient information. MASHA explained that the next transaction could be conducted without CS-1 going to one of their agents because her brother would fill out the HOMEACCESS forms for CS-1 and then fax them to MASHA, who would put the deposit slip in CS-1's file at HOMEACCESS. MASHA promised to "break down" the money for CS-1 to put his/her mind at rest. She also reminded CS-1 to think of who can help him/her out in this type of situation in future transactions. Finally, CS-1 discussed the idea of bringing between forty to fifty thousand dollars to Atlanta, Georgia, for deposit, and MASHA agreed that CS-1 could come to Atlanta, but would have to use another person to do multiple deposits over a several-day time period.

57.    On or about March 8, 2006, CS-1 called MASHA and obtained her brother's cellular telephone number. MASHA told CS-1 to call her brother that afternoon. At approximately 3:45 p.m. that day, CS-1 called MASHA's brother, who told CS-1 that they could make the entire deposit at one Bank of America branch. MASHA's

brother told CS-1 to meet him at the Bank of America on South LaSalle in Chicago.

58.    On or about March 9, 2006, DEA agents met with CS-1 at a predetermined location and provided CS-1 with recording equipment and $15,550 OAF ($7,800 in one envelope and $7,750 in another).  At approximately 9:00 a.m., DEA agents saw CS-1 walk to the east side of the Bank of America building at 231 South LaSalle and get into a black colored 2001 4-door Toyota registered in the name of MASHA's brother.

59.    While in the vehicle, CS-1 and MASHA's brother discussed the pending transaction.  MASHA's brother stated, "Hold on a second.  Just a second.  You know what?  Hello, we cannot do it here.  We have to split it.  She said we should do it in two accounts.  One is for nine thousand seven hundred and fifty and the other one, five thousand two hundred and fifty" (meaning that MASHA had given MASHA's brother instructions of how to split up the deposits).  MASHA's brother then called MASHA to obtain additional instructions for the deposit and how to split it between MASHA's brother and CS-1.

60.    After the call, MASHA's brother stated, "She said it is fifteen fifty.  So we are short of five fifty.  Where do you want to put the five fifty?  This is how she said we should do it.  She said we should do nine thousand four hundred and fifty in one account.  You cannot do ten thousand at a time" (meaning that they had to split the money into amounts under $10,000 to avoid federal currency reporting requirements).  CS-1 stated, "Okay, I should do that one?" and MASHA's brother replied, "Yeah, in one account.  Then for another account, she said we should do six thousand one hundred."

29

MASHA's brother continued to do additional calculations and confirmed that they had to use two different accounts. He stated, "But this is what you are going to do. You said you have counted it and that one is.....Yeah, but the one I am going to do. This is the one I am going to do. Once we are inside the bank, we do not need to talk to each other. That [is] what I am trying to do. We will just go to the teller, do what we got to do and get out. I mean, actually, I can just give you the number, write this account number for you and when we enter...This is the account number that you will use." MASHA's brother then took a call from MASHA, who provided further instructions and clarification regarding the deposit amounts and deducting the fee from the total deposit amount.

61.    At approximately 9:30 a.m., DEA agents saw CS-1 and MASHA's brother get out of MASHA's brother's vehicle and enter the bank. They walked to a self-service counter and filled out the appropriate deposit slips. CS-1 then walked to one teller counter and made a deposit of $9,450 to a HOMEACCESS account. MASHA's brother went to a different teller counter and made two deposits of $850 and $5,250 with the remaining money. At approximately 9:56 a.m., CS-1 and MASHA's brother left the bank and entered MASHA's brother's vehicle. MASHA's brother was carrying papers in his hand.

62.    DEA agents have obtained a compact disc containing security camera video footage from Bank of America. During the footage of March 9, 2006, at the 231 South LaSalle branch, MASHA's brother and CS-1 can be seen depositing money at two separate teller counters. CS-1 has positively identified MASHA's brother in the video as the same person CS-1 met.

30

63.    After they returned to the vehicle, MASHA's brother called MASHA and they discussed the deposit amounts and receipts.  When MASHA's brother told MASHA that CS-1 wanted proof that she sent the money, MASHA asked to speak with CS-1.  CS-1 explained to MASHA that the receipt shows that the money has just been sent and stated, "Maybe if you, you know, you should try and understand what I mean, because, you know, I have to show it to the person that I did the money for.  You know that I cannot just go back home without it.  Maybe I could do a copy of it, and he takes the original.  I have to, you know.  What exactly do you want me to do?"  MASHA replied, "Our account number is written on the receipt.  For security reasons, we do not give out the receipt to our customers."  CS-1 stated, "I have nothing to do with your account number, Auntie BUNMI.  Do you understand what I mean?  I don't even think the account number is written on the receipt, they only wrote the last four digits on it.  Your real account number is not on it" (meaning that CS-1 wanted a copy of the Bank of America receipt to prove to his/her "friend" that the money had been sent, but MASHA did not want CS-1 to know the account numbers for HOMEACCESS).

64.    After the call with MASHA, CS-1 discussed making a copy of the deposit receipts so that they both have copies.  At approximately 10:01 a.m., DEA agents saw CS-1 get out of MASHA's brother's vehicle and walk to a store at Clark and Monroe Streets to make copies of the deposit receipts.  A few minutes later, CS-1 went back to MASHA's brother's vehicle and gave him his copies of the deposit receipts.  Later, CS-1 provided the original deposit receipts to DEA agents, who copied them and returned the originals for mailing to HOMEACCESS, as requested by MASHA.

31

65.    Later that same day, at approximately 10:45 a.m., CS-1 called to MASHA to obtain the sender names, dollar amounts and transfer control numbers for the $15,550.00 deposit so that CS-1 would be able to coordinate the pick-up of the money in Nigeria.  MASHA gave some of the information to CS-1 over the phone, but then said that she would fax the HOMEACCESS "sender forms" to CS-1.  At several points during the call, when MASHA gave dollar amounts in Yoruba, CS-1 would repeat the amounts back in English, and MASHA admonished CS-1 to stop using English.  MASHA also told CS-1 to find other people's names to use as money senders in future transactions.

66.    On or about March 10, 2006, CS-1 provided DEA agents with a five-page facsimile of the HOME ACCESS sender forms from the $15,550 deposit conducted the previous day.  The fax was sent by "Ms. MONI, HOMEACCESS/OMEGABANK, fax number (678) 966-0081, March 9, 2006."   The right side of the forms in the shaded area designated "Agency Use Only" contained the following information:

| Agency Code | HA 1101 | HA 1101 | HA1 101 | HA 1101 |
|---|---|---|---|---|
| Homeaccess Operator | HA 201 | HA 201 | HA 201 | HA 201 |
| Charges | $125 | 125 | $125 | $11 5.50 |
| Total Amount | $26 25 | $26 25 | $262 5 | $2, 425.50 |
| Exchange Rate | 136 | 136 | 136 | 136 |
| NAIRA to be Collected | 340 ,000 | 340 ,000 | 340, 000 | 314 ,160 |
| Transfer Control Number | T31 856DJ | T31 858DJ | T31 857DJ | T31 859DJ |

32

67.     In addition to the above-listed information, the HOMEACCESS forms listed four names and addresses as the purported senders of the money that was deposited to the HOMEACCESS accounts for wire transfer to Nigeria.  DEA agents ran the names and addresses, which had been provided on the HOMEACCESS money transfer forms, and found that no such persons were affiliated with those addresses. Therefore, based on my experience, I believe they are false names and addresses provided to disguise the actual source of the funds, who was CS-1.

68.     According to bank records obtained by DEA, a total of $15,550 cash was deposited into two HOMEACCESS accounts on or about March 9, 2006.  Deposits of $9,450 and $850 were deposited to HOMEACCESS Bank of America checking account number 0032-6303-4540 and a $5,250 deposit went into HOMEACCESS Bank of America checking account number 0032-8696-1232, which was held in the name Individual B and Olabisi ADEYEMI BAJO. On or about March 14, 2006, there was a $45,000 wire transfer from HOMEACCESS Bank of America checking account number 0032-6303-4540 to OMEGABANK in Nigeria.

69.     On or about March 13, 2006, UC-1 went to SPRINGBANK in Lagos, Nigeria and met with Individual B, treasurer of SPRINGBANK.  He provided $5,000 in U.S. Currency to the UC-1.   On or about March 15, 2006, UC-1 returned to SPRINGBANK, where UC-1 received 1,334,160 Naira (the approximate equivalent of $9,810.00 USC), paid out in four separate amounts of 340,000, 340,000, 340,000 and 314,160.  UC-1 received four separate control numbers for each pay-out, which were the same control numbers matched the ones given to CS-1 by MASHA.

33

### April 20, 2006  Deposit of $40,000 in Atlanta, Georgia

70.    During the period from April 10-20, 2006, CS-1 participated in several recorded telephone calls with MASHA at HOMEACCESS, during which they discussed CS-1's planned trip to Atlanta, Georgia, to deposit approximately $40,000 to HOMEACCESS for transfer to Nigeria.

71.    On or about April 10, 2006, CS-1 spoke with MASHA regarding the transportation of $40,000 from Chicago to Atlanta, but MASHA told CS-1 that the airports were too strict at the moment and that it was too dangerous to transport that amount of money and CS-1 should just deposit the money in Chicago instead. MASHA boasted that she would often take receipt of $200,000 per week from customers in Atlanta and send it to Nigeria. MASHA said that she obtained help from another person when depositing the $200,000 to the bank and that she and the other person would pretend not to know each other while making the deposits. MASHA told CS-1 to do the same thing and find someone in Chicago to help make the $40,000 deposit, explaining that they each could make individual deposits of $8,000 or $9,000, until they hit $40,000 total. That way, MASHA explained, the bank would not ask for identification since the amount of each deposit would be less than $10,000. MASHA clarified that CS-1 and the other person should pretend not to know each other when making the deposits inside the bank.

72.    During a later telephone call on that same day, CS-1 called MASHA and explained, given the security situation at the airports, CS-1 and his/her friend would drive the $40,000 to Atlanta. MASHA told CS-1 to call when they were close to Atlanta

34

so that MASHA could meet them at her office. On or about April 18, 2006, MASHA told CS-1 that the address for HOMEACCESS was "4126 Pleasantdale, Atlanta, Georgia." CS-1 explained that they were running into delays because the people who owed them money were late in paying, but that they expected to be in Atlanta on Thursday (April 20, 2006). MASHA told CS-1 to come by her office when they got to Atlanta.

73.     On or about April 19, 2006, $40,000 OAF was transported from Chicago to the Atlanta area by DEA agents. On or about April 20, 2006, CS-1 traveled to Atlanta and met with agents from Chicago and Atlanta at a predetermined meet location. CS-1 called MASHA to coordinate a meeting at HOMEACCESS. CS-1 confirmed with MASHA that the entire $40,000, less fees, would be available for collection in Nigeria, to be paid in Naira, the Nigerian currency.

74.     Agents provided CS-1 with recording equipment and the $40,000, and, at approximately 4:33 pm, they saw CS-1 travel to HOMEACCESS at 4126 Pleasantdale Road, Atlanta. At approximately 4:45 pm, CS-1 parked the vehicle in the rear lot and met with MASHA. They then entered the HOMEACCESS office on the 2nd floor together.

75.     During the meeting, MASHA showed CS-1 the office, including files pertaining to other customers who send money to Nigeria. MASHA stated, "Then let me quickly show you some things. I just want you to have a look at about two people's accounts. Five million" and CS-1 asked, "Is it in Nai?" (meaning that MASHA showed CS-1 the file of another customer who sent approximately $37,000 to Nigeria, which is approximately 5,000,000 Naira, the Nigerian currency). MASHA said, "It is in fix

35

deposit. Then this is the one of fifteen million" (approximately $110,000). CS-1 asked, "They will collect in Niger, over there?" and MASHA replied, "Umm-hmm. Thirteen million. This one is thirteen million, the first one. This person paid into our account, and this has been long with us. Then different people from different places" (approximately $95,000).

76.    MASHA then explained to CS-1 how she divides up the deposits and then destroys the documents pertaining to the transactions. MASHA stated, "You see this is also owned by someone else. Do you see how I have divided it? Different names of people that sent it and different names of the people that collected it. [This one] gave me seventy six when I did it for him. He brought in seventy six, that's what he sent" and CS-1 replied, "Seventy six thousand dollars, woah! That's what he sent?" (meaning that MASHA showed CS-1 paperwork that revealed how she sent $76,000 in smaller amounts, with different names of people who supposedly sent the money and other names of those who picked up the money in Nigeria). MASHA continued, "So this is another person owns with twelve. One person owns these three that is twelve. I have erased [the] name. I've just recently erased it. These two accounts are owned by two siblings. So, do you see that one, it shouldn't be there. I will soon destroy it when I am done with some calculations on it. That's why I have not printed it. Once I will remove everything that is relevant, nobody can see any trace of it. So that's how we are" (meaning that MASHA explained that paperwork reflecting money sent by two siblings would be destroyed once the transaction was completed).

77.    As the meeting continued, CS-1 explained to MASHA how s/he and

36

his/her friend conducted their business and how they needed a reliable method to send money to Nigeria. CS-1 said, "You see my [friend's] elder brother lives in Lagos. He throws things this way a lot, especially in Chicago. You understand me? As we speak now, he has a lot of deals, like in Indiana where I called you today, you understand?" CS-1 continued, "They slowed us down, in the collection of money. We were trying to make sure we collect the money complete....That was what's slowed us down. What I am trying to tell you is that some people have arrived now....So we will be doing a lot of cash very soon. Now I have rest of mind. I will be able to explain to [my friend] now that we have someone we can trust....[My friend] does not like to meet with people because [my friend] is very careful you understand?....[My friend] sometimes drops a hundred thousand, sometimes two. That's how [my friend] usually drops it for them, and the man you said has gone to Lagos....Those are the people [my friend] trusts....[We are] really happy to know this place." MASHA replied, "Once you can get to this place, no problem" (meaning that as long as CS-1 gets the money to HOMEACCESS in Atlanta, it was easy to transfer it to Nigeria).

78.    MASHA then discussed the issue of receipts that she was willing to give to CS-1 for the money. CS-1 stated, "Okay. But you are only issuing one receipt for all of it" and MASHA replied, "Hmm. I will give you receipt for this one. One of it. Then you should tear it" (meaning that MASHA would give CS-1 a receipt for the money deposited at HOMEACCESS, but instructed CS-1 to destroy the receipt after the money gets to Nigeria). MASHA continued, "So tomorrow, the three of us will do some. . . . [A]nd three of us we all do it seven, seven. Tomorrow is Friday, so I will take the remaining these

37

on Monday. So [UC-1] can collect some tomorrow afternoon....the rest of it can be collected on Monday" (meaning that MASHA and two of her associates would each deposit $7,000 of CS-1's money the next day (Friday) and then they would repeat the process on the following Monday, so that the entire $40,000 would be in Nigeria by Monday).

79.    Later in the conversation, CS-1 asked MASHA how to proceed if s/he has a lot of money and doesn't want to travel to Atlanta. MASHA stated, "If you can not come, you just pay it into the account. Call me, I will give you about three accounts. You will just take it there fast, fast. You shouldn't do it in a day. You can pay in five, five today, the next day, another five, five. For three people five, five a day. If the three of them do five, five, in two days, they have done thirty. That's how I do it too" (meaning that MASHA told CS-1 to get two associates to help him/her and if the three individuals each deposit $5,000 per day, then they could do $15,000 total each day and repeat the process until the entire amount is deposited into three different HOMEACCESS accounts). CS-1 said, "I understand at least, if at any time we want to do about a hundred we would be able to do it within a week," and MASHA replied, "When you finish doing it, within a week, they will collect it in Lagos" (meaning that, in about a week, CS-1 should be able to deposit $100,000 into HOMEACCESS accounts and then the money would be available for pick-up in Nigeria).

80.    Finally, while MASHA and CS-1 were discussing the deposits that they were planning to make that day, MASHA stated, "This money looks tattered. Ha! This is great." MASHA also spoke to Individual C over the telephone and played the call

over the speaker phone, so that CS-1 could hear the conversation. MASHA said to Individual C, "I was trying to call [Individual D]. [Individual E] called." CS-1 stated, "I hope everything is okay," and MASHA replied, "Yes everything is okay. I just want to make sure that everything is going on smoothly. I would not want them to sell me in broad daylight. Children of this day are too smart" (meaning that they were discussing MASHA'S associates making structured deposits safely and without detection by bank officials or law enforcement). At that point, MONI stated, "And they will pretend as if not happen" (meaning that MASHA'S associates would not talk with authorities if they were ever questioned regarding the structured deposits). MASHA said to CS-1, "This is just [what] I was telling you. Now you can now see what we go through" and then continued talking to Individual C on the telephone, saying "Where are you?" Individual C responded, "We went to collect. We went to the other [U/I] and saw one." MASHA replied, "Okay. Do not stay too long because I have business for you and [Individual E]. Be fast."

81. At approximately 5:32 pm, DEA agents saw CS-1 and MASHA leave HOMEACCESS. CS-1 got into his/her car and drove to a predetermined location to meet with the agents. At that time, CS-1 provided the agents with the original HOMEACCESS transfer form, which contained the following information on the right side of the form in the shaded area designated "Agency Use Only":

39

| Agency Code | HA 1101 |
|---|---|
| Homeaccess Operator | HA 201 |
| Charges | $1, 900 |
| Total Amount | $38 ,100 |
| Exchange Rate | 138 |
| NAIRA to be Collected | 5,2 57,800 |

82.    After CS-1 left HOMEACCESS to meet with DEA agents, other agents stayed behind and saw Individual C and Individual E arrive at approximately 5:40 pm and enter the HOMEACCESS office.  At approximately 5:57 pm, agents saw Individual C, Individual E, and MONI leave the office together, get into a green Honda Accord registered to MASHA, and drive to a grocery store in Atlanta.  At the grocery store, agents saw Individual E pass a package to Individual C.  Individual C then got out of the car and entered the grocery store.  A few minutes later, Individual E and MONI also entered the grocery store.  Agents saw all three individuals enter the teller line at the Bank of America branch in the grocery store and each of them appeared to make a deposit.  After they had each completed their transaction, they all left the store, got back into the Honda and returned to the HOMEACCESS office.

83.    According to bank records obtained by DEA, two separate deposits of $9,000 and $7,000 were made on April 21, 2006 (the date of the deposits was April 21 because they were made late in the business day on April 20) to Bank of America

40

account number 0032-8696-1232, which was held in the name Individual B (HOMEACCESS' contact in Nigeria], and an additional $9,000 was deposited into Bank of America account number 0032-8696-1224, which was held in the name of Individual D (MONI's daughter). Likewise, bank records indicated that there was an additional $9,500 deposit made into account number 0032-8696-1224 on April 24, 2006.

84.    There is also currently not any known transfer via wire, check, or other means, out of either of the above mentioned Bank of America accounts which would explain how the funds were able to be retrieved in Nigeria.  Nonetheless, on or about May 9, 2006, UC-1 collected 5,257,800 Naira (the approximate equivalent of $38,100 in U.S. Currency) from SPRINGBANK in Nigeria.

### June 27-28, 2006 Deposits Totaling $40,000 in Chicago

85.    During the period from May 31, 2006, through June 26, 2006, CS-1 participated in several recorded telephone calls with MASHA at HOMEACCESS, during which they discussed the deposit and transfer of an additional $40,000 from Chicago to Nigeria.

86.    On or about May 31, 2006, at approximately 11:20 am, CS-1 called MASHA on her cellular telephone, number (678) 772-8453, to discuss the next transaction. During the call, MASHA stated that there was no need for CS-1 to travel to Atlanta because there was a person in Chicago who would help CS-1 deposit the money into HOMEACCESS accounts.  MASHA told CS-1 that she would put CS-1 in contact with this person when the money was ready, and she stressed that CS-1 needs to trust her.

41

87.    On or about June 27, 2006, at approximately 10:45 am, CS-1 participated in a series of telephone calls with MASHA to make final arrangements to coordinate the deposit of $40,000 into HOMEACCESS bank accounts in Chicago.  During one of the calls, CS-1 provided MASHA with the fax number for a fax machine at a store, located at a business 200 South Clark, Chicago, Illinois, so that MASHA could fax CS-1 the bank account numbers to use for the deposit.  At approximately 11:00 am, MASHA called CS-1 and indicated that she would just give CS-1 the account numbers over the telephone.  At approximately 11:22 am, MASHA called CS-1 and told CS-1 to make a $7,000 deposit and an $8,000 deposit to Bank of America on June 27, 2006, and then provide the remaining $25,000 to MASHA'S brother, for him to deposit on June 28, 2006.  MASHA provided CS-1 with MASHA's brother's cellular telephone number.

88.    DEA agents decided that it was not safe to deliver $25,000 to MASHA's brother without being able to document the transaction and therefore instructed CS-1 to call MASHA and discuss another method of depositing the remaining $25,000.  At approximately 11:37 am, CS-1 called MASHA and asked whether s/he could use a friend to help make the deposits, so that they could deposit $30,000 in one day. MASHA agreed with this idea and provided CS-1 with one Bank of America account number 03121-0056-3217, which was in the name Individual D and one Wachovia Bank account number 101-002-233-7481, which was in the name OLUBUNMI MASHA.

89.    On or about June 27, 2006, DEA agents provided CS-1 and another undercover agent ("UC-2") with $30,000 OAF.  CS-1 and UC-2 each took $15,000 and split it into two amounts of $8,000 and $7,000.  They then entered the Bank of America

42

branch located at 231 South LaSalle Street in Chicago and attempted to make deposits into the account provided by MASHA. According to a bank teller the account number was incorrect, so CS-1 left the bank and called MASHA. MASHA checked into the situation and called CS-1 back and provided CS-1 with a different Bank of America account number 4356-1901-5241-9926, stating that the other account number was for Individual D's father. A few minutes later, MASHA called CS-1 again and provided yet another account number, 0032-8696-1224, which was held in the name Individual D. CS-1 and UC-2 then re-entered the same Bank of America branch and made deposits into account number 0032-8696-1224. CS-1 deposited $8,000 and UC-2 deposited $7,000.

90.    Several minutes after the deposits were made, CS-1 called MASHA and they agreed that CS-1 and UC-2 should deposit the remaining $15,000 in a different Bank of America branch in Chicago. Therefore, at approximately 2:36 pm, CS-1 and UC-2 entered the Bank of America branch located at 205 West Monroe in Chicago, where CS-1 deposited $7,000 and UC-2 deposited $8,000. After making the deposits, CS-1 called MASHA, who provided CS-1 with fax number (678) 966-0081, to which CS-1 could fax the deposit receipts. CS-1 entered a store at 200 South Clark in Chicago and faxed the deposit slips to MASHA.

91.    The next day, on or about June 28, 2006, DEA agents provided CS-1 with an additional $10,000 OAF to deposit to HOMEACCESS accounts. CS-1 then went directly to the Bank of America branches at 231 South LaSalle Street and 205 West Monroe Street in Chicago, where s/he made deposits of $5,000 each. CS-1 then went

43

to the store at 200 South Clark Street and faxed the deposit receipts to MASHA.

92.    On or about August 4, 2006, CS-1 received a piece of mail from MASHA that contained one HOMEACCESS transfer form, which contained the following information:

| | |
|---|---|
| *Agency Code* | *HA441* |
| *Homeaccess Operator* | *HA260* |
| *Charges* | *1900* |
| *Total Amount* | *40,000* |
| *Exchange Rate* | *128* |
| *NAIRA to be Collected* | *4,876,800* |
| *Transfer Control Number* | *T32300H1* |

93.    According to bank records obtained by DEA, there were four deposits ($8,000, $7,000, $7,000 & $8,000) made on June 27, 2006 to Bank of America account number 0032-8696-1224, which was held in the name Individual D. On June 28, 2006, there were two additional deposits of $5,000 each into the same account. On June 30, 2006, check number 108 for $5,000 was written from Individual D's account to payee, "Pay Self Cash." On July 3, 2006, check number 109 for $8,000 was written to "MS BUNMI MASHA (Wachovia)." On July 7, 2006, check number 111 for $9,000 was written to Individual B. On July 14, 2006, check number 114 for $9,000 was written to Individual B. On July 19, 2006, check number 116 for $10,000 was written to "MS BUNMI MASHA (Wachovia)." The total of these checks is $41,000, which is slightly

44

more than the deposit originally made by CS-1 and UC-2.

94.    On or about July 4, 2006, another OMEGABANK manager contacted UC-1 and advised that the money was ready for pick-up in Nigeria. On or about July 6, 2006, UC-1 received 5,120,000 Naira, which approximately equals $40,000, from a branch of OMEGABANK in Nigeria.

### *March 7, 2007 Deposits Totaling $50,000 in Atlanta*

95.    On or about December 22, 2006, CS-1 called MASHA and stated that, "You remembered I told you that he is in Lagos. So, Lagos that he is now at, you know, when, now that he is in Lagos, the opportunity is not, everything that he wants to accomplish is for him to organize a way, how, you know? How people will come and in turn generates new money, you understand? So, while in Lagos and those people, and he already sent the people to America, you understand? That was how those people were detained at the port of entry. It became a serious problem, whereby he himself, I feel so sorry for him. He lost a lot of money. You know? He lost lots of money, you know? Because those people were detained at the port of entry, so that is the problem right now. You know. It's in New York. It's in New York. So you understand? All that trouble. Where? You understand? That is how the whole problem, so that is the reason why that, you know, why he too figured that okay, perhaps he should start on another consignment. You understand? So that money can materialize because it makes no sense to return here [the U.S.] and no business to speak of. You understand? So, that is the reason why he is still in Lagos."

96.    On or about January 24, 2007, CS-1 called MASHA. During the call, CS-1

used coded language to tell MASHA that his/her friend had acquired additional drugs in New York and was traveling to South Carolina to sell a portion of those drugs and collect additional drug proceeds. CS-1 stated, "So, you know, everything has now – you know, another shipment has arrived in New York and so, money, he collects it fast. So, it seems as if he will collect the money and once he finished collecting some money in New York, he will also go and collect some other monies in South Carolina. So, he will be driving. So, once he drives, I will meet up with him over there [South Carolina] and we will come and meet up with you in Atlanta. Do you understand? But we will do more than forty, perhaps fifty, up to sixty. I don't know. But I'm sure it going to be more than forty. So he said that he, that because of those he has to give money in Lagos, they have to quickly collect on certain monies but he too is, he just said I should call you and let you know that we are, that he has arrived at New York so everything, so we want to arrange how we want to come and see you." CS-1 is referring to the amount of the deposit, between $50,000 and $60,000, he/she expects to make to MASHA at HOMEACCESS in Atlanta, GA for transfer to Nigeria.

97.    On or about February 23, 2007, at approximately 10:45 p.m., MASHA called CS-1 to check the status of the transaction, and CS-1 told MASHA that the friend was still in New York running around, meaning collecting money.  MASHA told CS-1 that she needed dollars badly, but CS-1 stated that s/he couldn't say anything until s/he talked to his/her friend.

98.    On or about February 26, 2007, CS-1 called MASHA's cellular telephone number and told MASHA that his/her friend was still collecting drug proceeds from

customers and hoped to travel to Atlanta within the next week or two to meet to make the transfer to Nigeria. MASHA stated that there was no need to travel to Atlanta because they could deposit the money in Chicago, but CS-1 explained that his/her friend was coming from New York, collecting additional money on the way to Atlanta and did not want to travel back to Chicago with that much money. MASHA said that she understood and agreed to them coming to Atlanta with the money.

99.    On or about March 5-7, 2007, CS-1 participated in a series of recorded telephone calls with MASHA to make arrangements to deposit approximately $50,000 to HOMEACCESS in Atlanta on or about March 7, 2007. During the first call, MASHA told CS-1 that the money would be ready for pickup in Nigeria by Friday, March 9, 2007, if the deposit was made the following day, Tuesday, March 6, 2007. The two spoke again on or about March 6, 2007, and MASHA stated that she was waiting on CS-1. CS-1 told MASHA that s/he would be coming to Atlanta the next day and would deposit $50,000 with MASHA after collecting the rest of the money.

100.    On or about March 7, 2007, CS-1 participated in a couple of calls with MASHA, during which CS-1 told MASHA that s/he had collected the money, which was now in Atlanta. CS-1 said that s/he would be bringing $50,000 to MASHA'S office later that afternoon. Later that afternoon, DEA agents met with CS-1 at a predetermined location and provided CS-1 with $50,000 OAF, which CS-1 then transported to HOMEACCESS. CS-1 entered the business at approximately 5:33 pm. During surveillance of HOMEACCESS, DEA agents saw a silver Acura that was registered to Individual E arrive at HOMEACCESS. Agents saw a black male, a black female and a

47

black child get out of the car and enter the HOMEACCESS office.

101.    During the meeting inside HOMEACCESS, CS-1 met MASHA and MONI. CS-1 noted that MONI's husband and MONI's child were also present in the HOMEACCESS office.  MASHA told MONI's husband that she needed his wife to help count money, and then MASHA, MONI and CS-1 went into a separate office to count the money.  MASHA told CS-1 that because the deposit was made so late in the day, the money would not be ready for pickup in Nigeria until the following Monday, March 12, 2007.  MASHA told CS-1 that she would call CS-1 with the contact name and telephone number for pickup of the money in Nigeria and that she would be keeping the money at the HOMEACCESS office overnight.  MASHA stated that she would see to it that the money was deposited in small amounts the next day and the day after that because she had to be very careful these days.  CS-1 insisted on getting a receipt for the money to show his/her friend as proof that the money was delivered to HOMEACCESS.  MASHA agreed to give a receipt, but insisted that CS-1 destroy it as soon as possible because the receipt was dangerous.

102.    At approximately 6:41pm, CS-1 left the business and drove to the predetermined meet location to meet with agents.  At that time, CS-1 provided agents with an original HOMEACCESS sender form containing the following information:

| Agency Code | HAH01 |
|---|---|
| Homeaccess Operator | |
| Charges | |
| Total Amount | |
| Exchange Rate | 127 |
| NAIRA to be Collected | 6,045,200 |
| Transfer Control Number | |

103.    On or about March 7, 2007, CS-1 received contact information for the money pickup in Nigeria, and this information was passed by DEA to UC-1 in Nigeria. Because the regular point of contact was out of the country, they were given a new point of contact (Individual F) as well as a new telephone number.

104.    On or about March 12, 2007, UC-1 called Individual F to arrange for pick up of the currency and Individual F advised that the money would be ready the next day around noon.    On or about March 13, 2007, at approximately 10:30 a.m., two undercover DEA agents traveled to a computer company in Ikaje, Nigeria, to meet Individual F. Upon arriving at the company, the receptionist told one of the agents that Individual F was not in at the moment, so the agents left.  On or about March 14, 2007, at approximately 10:10 am, the two agents returned to the computer company and met Individual F. The agents then followed him to First Bank, where one of the agents would cash a check written by him.  The check was written from his personal checking account from First Bank of Nigeria PLC, account number 011154479, for 6,045,200 Naira.

49

However, they traveled to several branches of First Bank, and none of the branches had that much money on hand. Therefore, the next day, March 15, 2007, two agents met with a woman at a First Bank branch to obtain the money. She confirmed that she had spoken with Individual F, and she escorted the agents to the vault, where they were given 6,045,200 Naira, which was the approximate equivalent of $47,228.12 U.S. Currency. Based on records reviewed to date, Affiant has been able to trace wire transfers from the March 7, 2007, transfer to MASHA to the receipt of the 6,045,200 Naira in Nigeria.

105.    According to Bank of America records obtained by DEA, on or about March 8, 2007, there was a $4,000 cash deposit at an ATM machine in Winder, Georgia, made to account number 0032-8696-1224, which was held in the name Individual D. On or about March 9, 2007, there was a $6,040 cash deposit into the same account at the Bank of America branch in Winder, Georgia. The signatory on this deposit slip was Individual D. In addition, on or about March 12, 2007, there was a $10,000 wire transfer from account number 0032-8696-1224 to another domestic account.

106.    On May 14, 2007, at approximately 4:29 pm, MASHA called the CS' cellular telephone. The CS and her cellular telephone were then in Chicago. Shortly afterwards, on the same day, the CS called Affiant to advise him of this telephone call. Affiant directed the CS to return MASHA's call and to advise him of what was said during the conversation. At approximately 7:59 pm, the CS, in Chicago, called MASHA and spoke with her. This call was not recorded. The CS then called Affiant and related

50

that MASHA had called to see when the CS was coming back to Atlanta, GA. The CS related to MASHA that he/she was waiting on his/her friend to get more money together and that they would be in touch with MASHA soon. However, it was going to take awhile to get the money together, especially since it was going to be more than $50,000.00 USC. According to the CS, MASHA was excited about the new, larger amount of US Currency and would be waiting to hear from the CS.

107.    On September 20, 2007, from the DEA Chicago Field Division office, Affiant called the CS, who was then in Chicago,  and directed him/her to place a three-way telephone call to HOMEACCESS' office telephone number, (678) 966-0001, so that the call could be recorded. At approximately 4:30 p.m., the CS called (678) 966-0001, while Affiant monitored the call. After one or two rings, Affiant heard a recording saying that the number had been temporarily disconnected. This call was not recorded. Affiant then directed the CS to place another 3-way call to MASHA's cellular telephone, (678) 772-8453, so that the call could be monitored and recorded. MASHA answered the telephone and spoke with the CS in a Nigerian dialect, Yoruba. Following the telephone call, the CS summarized the conversation in English to Affiant. According to the CS, MASHA related that she was no longer working at HOMEACCESS because she had found a new job at the Union Bank of Africa (UBA), where she was receiving a better salary than at HOMEACCESS. MASHA related that her new job was in New York, NY, but that she was still alternating her time between Atlanta and New York. MASHA further related that she was spending the week of September 17, 2007, in Atlanta, that she had spent the previous week in New York and that she would be back in New York

51

during the week of September 24, 2007. MASHA provided her new work telephone number, (212) 308-7222, extension 364, to the CS. MASHA stated that the CS could still bring money to Atlanta and she (MASHA) would find a way to send the money to New York (for eventual transfer to Lagos, Nigeria).

108.    On September 22, 2007, the CS called Affiant and related that MASHA had left him/her a voicemail message that day on his/her cellular telephone, which was then in Chicago. The voicemail message was spoken in Yoruba. According to the CS, MASHA related that the CS should not call MASHA's new work telephone number, referenced above, if he/she wanted to discuss a money deposit and/or transfer. MASHA thought the police might be listening to the office telephone. MASHA further explained that the CS should call her cellular telephone if he/she wanted to talk about money.

109.    On September 22, 2007, at approximately 2:20 p.m., the CS placed another 3-way telephone call to MASHA's cellular telephone, (678) 772-8453. The call was monitored and recorded by Affiant. The CS again spoke with MASHA in Yoruba and summarized the conversation in English to Affiant. According to the CS, MASHA related that HOMEACCESS' office was closed for now but that the guy in Lagos, Nigeria, who owned HOMEACCESS was looking for someone else to run the office. MASHA related that MONI went back to school, implying that she also no longer worked at HOMEACCESS. MASHA further related that the government had seized $5 million from UBA and that was why she had left the message on the CS' phone, asking the CS not to call MASHA's work telephone and talk about money (deposit and transfer to

52

Nigeria).

110.   At approximately 5:20 p.m. on October 8, 2007, CS-1 placed a 3-way (Affiant monitored the call) telephone call to MASHA's cellular telephone.  With the exception of a few words, CS spoke with MASHA in Yoruba and, following the call, summarized the conversation in English to Affiant. According to CS-1, MASHA related that she was sick with a cold and was in Atlanta, GA, at the time but would be back in NY, NY, the following week. During the conversation MASHA stated that the bank (possibly SPRING BANK in Nigeria) was the owner of HOMEACCESS. CS-1 then related that he/she would be in Atlanta (with a $100,000.00 deposit) in either October 2007 or early November 2007. MASHA related that she had already spoken to Individual B and let him know about the money coming to Nigeria. MASHA related that it was CS-1 that they were waiting on (to bring $100,000.00 to Atlanta so that HOMEACCESS could transfer it for him/her to Nigeria).

111.   On October 30, 2007, MASHA called CS-1 but did not leave a message. On October 31, 2007, CS-1 called MASHA back. After an exchange of attempted calls. CS-1 had a three-way call with MASHA and with Affiant monitoring the call.  The conversation was mainly in Yoruba.  Afterwards, CS-1 summarized the call: CS-1 told MASHA that he/she wanted to meet at "the same place" (meaning the HOMEACCESS office) when he/she comes to Atlanta on Wednesday (November 7, 2007) or Thursday (November 8, 2007). MASHA replied that that was perfect.  MASHA further stated CS-1 should bring the entire $100,000 to the meeting (that is, not break it into $50,000 increments as previously suggested).  MASHA further stated that she (MASHA) would

53

be back in New York the following week (that is, the week of November 12, 2007).

FURTHER AFFIANT SAYETH NOT.


*Christopher Dillard*

Christopher Dillard, Special Agent
Drug Enforcement Administration


Sworn to and subscribed to before me on
this 6th day of November, 2007.

*Maria Valdez*

MARIA VALDEZ
United States Magistrate Judge
Northern District of Illinois

54